DAVID C. HALSTED v. STATE OF NEW JERSEY.

1. When an act, in general terms, is made indictable, a criminal intent need not be shown, unless, from the language or effects of the laws, a purpose to require the existence of such intent can be discovered.
2. The question appertains to the department of statutory construction, and to introduce into the act the requisite of a guilty mind, it must appear that such was the intent of the law maker.
3. In this case the duty prescribed being a simple one and easily performed, *held* that there was no ground on which the court could import into the act a requirement that to constitute guilt an intentional violation of the law must be shown.

On error to the Supreme Court. For opinion of Supreme Court, see 10 *Vroom* 402.

The defendant was the director of the board of freeholders of the county of Hudson, and was indicted for a violation of the act entitled " A supplement to an act entitled ' An act for the punishment of crimes,'" approved March 27th, 1874, which is as follows, viz.:

The act under which the indictment is sought to be sustained is found in the laws of 1876, page 16, as follows:

" 1. BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey,* That if any board of chosen freeholders, or any township committee, or any board of aldermen or common councilmen, or any board of education, or any board of commissioners of any county, township, city, town or borough in this state, or any committee or member of any such board or commission, shall disburse, order, or vote for the disbursement of public moneys, in excess of the appropriation respectively to any such board or committee, or shall incur obligations in excess of the appropriation and limit of expenditure provided by law for the purposes respectively of any such board or committee, the members thereof, and each member thereof, thus disbursing, ordering or voting for the disbursement and expenditure of public moneys, or thus incurring obligations in excess of the amount appropriated and

limit of expenditure as now or hereafter appropriated and limited by law, shall be severally deemed guilty of malfeasance in office, and on being thereof convicted shall be punished by fine not exceeding one thousand dollars or imprisonment at hard labor for any term not exceeding three years, or both, at the discretion of the court."

The facts alleged in the indictment were, that at a meeting of the board of freeholders, December 14th, 1876, a resolution was adopted for purchasing certain land for a court-house site for the sum of $225,720, to be paid for in bonds of the county, "payable out of the amount appropriated and limited for the next fiscal year"—that is, for the fiscal year to commence December 1st, 1877, "said bonds to run one year from date," &c.; that the defendant presided at this meeting and subsequently approved the resolution, and, together with the county collector, signed the bonds in accordance with the said resolution; that the next fiscal year after December 14th, 1876, would commence December 1st, 1877, and that no appropriation or limit of expenditure had been fixed for this latter year. It also appeared that for the fiscal year commencing on December 1st, 1876, the tax fixed by resolution was the sum of $600,000.

For the plaintiff in error, *H. C. Pitney* (with whom was *J. D. Bedle.*)

I make three points:

I. The indictment does not set out any indictable offence against the defendant.

II. None was proven against him at the trial.

III. The defence offered was a good one, and should have been received and submitted to the jury.

I. The indictment does not set out any indictable offence against the defendant.

A. The first count states the case as it was in substance proven on the traverse.

It may be summarized as follows:

*First.* The organization of the board of freeholders with defendant as director at large.

*Second.* A meeting of the board, December 14th, 1876, at which resolutions were adopted for purchasing Crampton's land for a court-house site, at a fixed sum for every two thousand five hundred square feet, to be paid for by a bond or bonds of the county "payable out of the amount appropriated and limited for the next fiscal year," that is, for the fiscal year commencing December 1st, 1877, "said bonds to run one year from date," &c.

*Third.* That defendant presided at said meeting.

*Fourth.* That certain of the freeholders—naming them—voted for, and certain against, said resolutions—defendant's name not being included.

*Fifth.* That defendant approved said resolutions, December 16th, 1876.

*Sixth.* Conveyance by Crampton to the county of the land in question, December, 22d, 1876.

*Seventh.* Delivery by Mr. Kingsland, the county collector, to Crampton, December 22d, 1876, of the three bonds, amounting in the aggregate to $225,720, sealed with the seal of the county, and signed by defendant as director at large, and E. W. Kingsland, county collector, payable December, 18th, 1877, with interest, and reciting their execution and issuance in pursuance of said resolutions.

*Eighth.* That the "next fiscal year," after December 14th, 1876, would commence December 1st, 1877.

*Ninth.* That no appropriation or limit of expenditure whatever had as yet been fixed for the fiscal year beginning December 1st, 1877.

"*And so* the grand inquest aforesaid," &c., "do say," "that the said board of chosen freeholders, on the said fourteenth day of December, &c., did thereby then and there incur obligations of the said board, &c., in excess of the appropriation and limit of expenditure, &c., for the fiscal year," &c., beginning December 1st, 1877, and that the defendant "so being

director at large, a member of the board," &c., on, &c., at, &c , " did *vote* for the incurring of obligations, and did *incur obligations* of the said board of chosen freeholders," &c., " and did approve the resolutions aforesaid by which the said obligations were incurred in excess,". &c., of the amount appropriated for the fiscal year beginning December 1st, 1877.

The act under which the indictment is sought to be sustained is found in the laws of 1876, page 16.

The acts forbidden by this statute are of two classes : First, *disbursing, ordering* or *voting* for the disbursement of public moneys in excess of appropriations.

Second, *incurring obligations* in excess of appropriations.

The *gravamen* of the first count is the *incurring obligations* in excess of the appropriation for the next fiscal year, which had not yet been fixed, or, in other words, incurring an obligation in *advance* of the appropriation from which, by its terms, it is to be paid.

The count, as above shown, distinctly charges that the bonds were to be paid out of the fiscal year December 1st, 1877, to December 1st, 1878, and that no appropriation or limit of expenditure had as yet been made or fixed for that year.

Then how can the " *obligation incurred* " be said to be " *in excess* " of the appropriation and limit, when the amount of that appropriation is not yet determined, and no " *limit* " has as yet been fixed, and none is " *provided by law ?*"

There is no " *limit of expenditure provided by law* " for a board of chosen freeholders, except its own collective wisdom and discretion.

The power and duty of the board to make the purchase and to raise money by taxation to pay for it, is undoubted. *Rev., p.* 128, § 4.

No corrupt motive or intent is charged. The case made is, that the board set about doing a lawful thing with an honest and proper motive, but adopted unlawful but not dishonest means for accomplishing it.

The well-known practice of the boards of chosen free-

holders of the several counties is to make one tax levy for county purposes each year, and it is their plain duty so to do, else what would become of our poor and our criminals, and our disputes about civil rights? How would our property and persons be protected?

An annual tax levy is a thing as much to be counted upon, as sure to come each year, as are the seasons.

The tax levy for any particular future year is, then, a matter to be spoken of and dealt with as having a potential existence.

The act of 1876 contemplates an actual existing limit, already fixed. The obligation is forbidden to be in excess of " *the appropriation* "—" *the limit.*"

The word " excess " here implies a *comparison* of two subjects which have a present existence, and are capable of being presently compared.

The context of the statute prevents any escape from this.

The legislature, by this statute, did not annex a penalty to incurring obligations in advance of an appropriation, that is, to be paid out of an appropriation yet to be made. It does not forbid anticipating or mortgaging future appropriations or tax levies.

It might have done so. Perhaps it would have been wise if it had done so. It is enough for us now to say that it did not do so.

This statute should be read in the light of the common understanding of common men in the view of the ordinary course of affairs, giving to the words their common and popular signification.

The language is, " in excess of *the* appropriation and limit," and implies a comparison, and it is proper and necessary in this connection to speak and think beforehand of the appropriation and limit for the fiscal year beginning December 1st, 1877, as a matter which will exist, and as capable of being taken into consideration as a thing *in posse,* though not *in esse.*

It follows, then, that an obligation incurred, and by its

terms to be paid out of the tax levy of the then next fiscal year, cannot be said to be in excess of that tax levy until the amount of that tax levy is fixed. It may, or it may not, prove to be in excess of it. The presumption is that the board will do its duty in the matter, and provide by its levy a fund sufficient to cover this and all other necessary expenses of the county. The same presumption exists in favor of such action, as that the board will provide funds to carry on the courts, and the like.

But here again we are met by the suggestion that this view would render the law futile, and enable any board of freeholders to incur indebtedness to an unlimited extent, by incurring obligations without making any tax levy to meet them.

The argument is thus stated :

"The argument that it is no crime to incur an obligation in advance of an appropriation—that it cannot be in excess of an appropriation until an appropriation is made—is equally untenable, and if well founded would render the law futile; in that case, the board could expend money without restraint, and defy the law by refusing to make any appropriation during their official existence, thus setting up their wilful refusal to discharge that duty as a defence to a criminal prosecution.

"The law is that the appropriation must precede the expenditure, and the allegation in the indictment that the defendants have issued bonds to the amount of $225,000 in excess, without a preceding appropriation to meet their payment, will, if proved, make them amenable to the criminal statute."

With great deference, the question whether it is a crime to incur an obligation in advance of an appropriation is the very point in dispute. And it is no disrespect to suggest that it would be well to prove it before assuming it.

No statute ever said so in terms, and I claim that it has not said so by implication.

So with regard to the law being that "the appropriation must precede the expenditure." No authority is pointed out

for it, and if it be so the breach if it is nowhere declared to be penal.   No statute that I know of declares that if a board of freeholders expend money before they have even levied a tax to raise it, (if such a thing be conceivable,) the members of the board shall be indictable for so doing, nor is there any charge of that kind in the count now under consideration.

So with the last position taken in the passage just quoted, that if the board have issued bonds in excess, (of what, pray?) without a preceding appropriation to meet their payment, it makes them amenable to the criminal statute.   This is the very point in dispute, and asserting it is not proving it.

The difficulty is that the acts charged in the count under consideration are not covered by the statute of 1876, and that statute cannot be strained or stretched to cover them, without a disregard of fundamental canons.

On this part of the case I cite *Weston* v. *Syracuse,* 17 *N. Y.* 110, and submit that many of the principles above contended for are there recognized.

B.  I come now to the second count, a summary of which is as follows:

*First.*  The organization of the board of freeholders, with defendant as director at large.

*Second.*  A meeting of the board, June 27th, 1876, at which a resolution was adopted fixing the tax to be raised for county purposes for the fiscal year commencing December 1st, 1876, at $600,000.

*Third.*  That defendant presided at that meeting.

*Fourth.*  That at that meeting there was a tie vote on said resolution fixing the levy at $600,000, and that defendant cast his vote in its favor.

*Fifth.*  That on the 1st of July, 1876, defendant approved the last-mentioned resolution.

*Sixth.*  That the sum of $600,000 so fixed was intended for ordinary county purposes, and was not intended to and did not include the sum of $225,720, thereinafter mentioned, or any sum to be expended for purchase of a court-house site, and that no further appropriation or limit of expenditure was

ever made by the board for the fiscal year commencing December 1st, 1876.

*Seventh.* Passage of act of 1875, and its provisions.

*Eighth.* The adoption of the resolutions of purchase of the Crampton property, as before set out, at a meeting held December 14th, 1876.

*Ninth.* That defendant presided at that meeting.

*Tenth.* States the names of those voting for and those voting against the same, among which defendant's name is not found.

*Eleventh.* That defendant approved the resolutions December 16th, 1876.

*Twelfth.* Sets out the conveyance by Crampton to the county of the land, and the delivery to him of the bonds by Mr. Kingsland, the county collector, at the time, and of the description before set out in the first count. *Ante p.* 553.

*Thirteenth.* " *And so the grand inquest do say* that the said board of chosen freeholders," &c., " on the 14th December, 1876, at," &c., " *did, thereby, then and there incur obligations of the said board,*" &c., " in excess of the appropriation and limit," &c., " for the fiscal year beginning December 1st, 1876," and that defendant so being director, &c , a member, &c., on December 14th, 1876, " *did unlawfully vote for incurring obligations of said board,*" " *did approve resolutions* incurring obligations of said board," and *with the assistance of his vote and approval* the said board of chosen freeholders was made to incur obligations of the said board, &c., in excess of the appropriation, &c., for the fiscal year beginning December 1st, 1876.

The evident design of the pleader was to charge an obligation in excess of the appropriation for the current fiscal year, and he was met *in limine* by two difficulties—*First.* The obligation, by its terms, was payable out of a particular appropriation, viz., the appropriation for the next fiscal year, and not that for the current fiscal year. The language of the resolution is, " and that in payment for said land there be issued to said Crampton a bond or bonds of the county of Hudson, payable out of the amount appropriated and limited

for the expense of the next fiscal year, meaning thereby the fiscal year commencing on the first day of December, in the year eighteen hundred and seventy-seven," &c., and the bonds which were issued in pursuance thereof recited this provision.

In the *second* place, the appropriation for the current fiscal year appeared quite large enough to meet this obligation, and if it was the measure of the power of the board, that measure did not appear to be exceeded, and to get over this difficulty the pleader could do no better than to insert the sixth paragraph of the second count, to the effect that the $600,000 tax levy *was intended* for the expenditure for the ordinary purposes of the county, and *was not intended to* and did not include the $225,720, or any sum to be expended for a court-house site, &c.

What is there shown in the indictment, or what legal impediment is shown, which would have prevented the board from taking $225,000 out of the $600,000 tax levy to pay for this land ?

In order to show an excess, it was necessary for the pleader, after showing the $600,000 tax levy, to allege that it had already been so far exhausted as to be reduced below $225,-000 when the resolutions were passed. This he does not do, and indeed could not truthfully do, for not only was the indictment found before, in the ordinary course of events, such a result could have been reached, but as I am well assured, as a matter of fact, more than $225,000 of that year's levy did remain unexpended, and was carried forward into the next year.

In the court below it does not appear to have been contended that there was any sufficient allegation of the exhaustion of the current tax levy. The objection now under consideration was disposed of on another ground, viz., that it was not necessary for the indictment to show any such exhaustion of the current tax levy, and that the defendants were estopped, so to speak, from setting up its sufficiency to cover the obligation, because that obligation, by its terms, was not payable out of it, but out of a future tax levy,

and so it was possible and legal for the board to spend the whole of the $600,000 levy for other purposes.

Now the vice of this position is, that it violates the rule that each count in an indictment must be consistent with itself, and must stand or fall on its own allegations. It cannot blow both hot and cold, and it cannot be helped by allegations contained in another count.

The theory of the count is that the appropriation or tax levy of the current fiscal year "furnishes the limit of expenditure provided by law for the purposes of the board" for that year, and the charge is that the obligation was incurred in excess of the appropriation for that year. Now if the June (1876) tax levy did furnish the lawful limit of expenditure and obligation for that year, it was the clear duty of the board, after having adopted the December resolutions, to deduct the amount thereof from the $600,000, and limit their subsequent expenditures accordingly. The board may not at the time have intended to do so, and such may not have been their plan, but men are not bound by their intentions and plans not actually carried out and executed. The law recognizes the *locus penitentiæ*, and there is no allegation in the indictment that the whole of the $600,000 was otherwise actually disposed of, as, indeed, there could not well be, since the bill was presented by the grand jury in January, 1877.

But it is urged that the board might have spent the whole $600,000 for other purposes, without incurring the penalties of the criminal statute of 1876.

To which I answer, that I do not see how that can be so on the only theory on which this count can stand. It seems to me that as soon as the board made any expenditure, or incurred any obligation in excess of $600,000 ($225,000—$375,000,) they would have brought themselves within the terms of the act. To hold the contrary is to hold the count bad.

The case, then, as made by this second count, is this: The fiscal year began December 1st, 1876, with a tax levy already provided for its wants of $600,000. On December 14th,

1876, and before any other inroads are shown to have been made in this $600,000, the obnoxious resolutions are passed, incurring an obligation of $225,000. It is charged that this $225,000 obligation is in excess of the as yet undiminished appropriation of $600,000, and the charge is attempted to be made out by showing that the obligation was, by its terms, to be paid out of a tax levy for a future year.

How in the name of common sense does that show $225,-000 to be greater than $600,000? or that the $225,000 obligation was in excess of the appropriation or legal limit of expenditure for the fiscal year commencing December 1st, 1876?

C. The remaining counts—third to tenth, inclusive—are all bad for want of explicitness. The pleader in them contented himself with general allegations.

D. But, admitting that the first two counts do, or one of them does, set out an offence as against the ordinary members of the board, yet we contend that Mr. Halsted was not an official mentioned in the act of 1876.

He was not a member of the board of freeholders in the sense in which that word is used in that act.

The solution of this question depends mainly upon the construction of the act of 1875, pages 324–327.

This act creates a new office of director at large. All through it is carefully distinguished from the office of member of the board. The elections are at different times, the salaries are different, the terms of office are not the same, and in making these distinctions the members of the board are treated as one body, and by *that name* distinguished from the director at large.

If Mr. Halsted can be indicted, it is only as a member of the board; but the very act which created his office, the office by which he is titled in the indictment and by virtue of which alone he acted, expressly excludes him when it speaks of members of the board.

The plain intent of this statute is to create a new office, not to invest a member of the board with different power, but by the act of 1876 only members of the board can be indicted.

If there were only a fair doubt that the statute embraces the new office, that doubt, according to the authorities, is to be resolved in favor of the accused.  But here there is more than a fair doubt.

To hold that such an officer can be indicted under a statute limited to " members " of a board, would be to supplement or supply the legislative will, and not merely to *interpret* it, which is the only legitimate function of a court.

" It belongs only to the legislative department to create crimes and ordain punishments.  Accordingly, courts in the construction of statutable offences, have always regarded it as their plain duty cautiously to keep clearly within the expressed will of the legislature, lest otherwise they should hold an act or an omission to be a crime, and punish it, when, in fact, the legislature had never so intended it." *United States* v. *Clayton,* 2 *Dill.* 219 ; *United States* v. *Morris,* 14 *Peters* 464 ; *United States* v. *Wiltberger,* 5 *Wheat.* 76 ; *United States* v. *Sheldon,* 2 *Wheat.* 119 ; *Ferritt* v. *Atwill,* 1 *Blatchf.* 156, and cases cited.

II.  There was no proof of any act done by Mr. Halsted which was forbidden by the statute.

He neither " disbursed," nor " ordered," nor " voted for any disbursement," nor did he " incur any obligation."

What he did do was to preside simply at the meeting at which the obnoxious resolutions were adopted, and afterwards, not during a session of the board, approve the resolutions in writing, and after that again sign the bonds thereby authorized, in connection with the collector of the county.

The two acts upon which the state must rely are the *approving* of the resolutions and the *signing* of the bonds.

*a.*  The approval of the resolutions is not within the act. The forbidden acts are to " *disburse* public moneys " and to " order " and " vote for " the disbursement of public money and the " *incurring obligations.*"

To approve in writing a resolution is not to " disburse " public money, for that refers to the act of paying out, nor is it to " vote " for the disbursement.

Nor is it to "order." An order, when used in relation to money, is defined to be "a direction in writing for the payment of money." *Webster's Dict.*

The only remaining prohibited act is to "incur obligations," and the indictment itself best shows the trouble and difficulty which the prosecutor of the Pleas had in trying to twist the act of the director at large in "approving in writing the resolution" into "incurring obligations" as a member of the board.

The charge is, "The said David C. Halsted, so being director at large, a member of the board of chosen freeholders of the county of Hudson as aforesaid, on the said fourteenth day of December, *did vote for the incurring of obligations, and did incur obligations of the said board of chosen freeholders of the county of Hudson, and did approve the resolution aforesaid by which said obligations were incurred in excess,*" &c, contrary to the form of the statute.

Here are apparently three acts charged:

1st. Voting for the *incurring of obligations.* But there is no law against that. The statute prohibits voting for the *disbursement,* not voting for the incurring of obligations.

2d. "Incurring obligations." This is the act with which the members of the board who voted for the resolutions are chargeable—if guilty at all. But Mr. Halsted's act, as laid in the indictment, is not embraced within the term "incur obligations."

His case is met by the third charge, viz.:

3d. "Approving the resolution by which said obligation was incurred."

To approve an act of legislation is very different from passing the act, so "to approve a resolution by which obligations are incurred" is entirely distinct from the act of incurring obligations. But it is only the act of "incurring obligations" which the statute has made an offence.

Acts hitherto legal are to be made *criminal* by a statute and four precise and definite acts are enumerated. Nothing can be added to them by construction. And yet the language

shows that no possible statement of Mr. Halsted's act can *in terms* bring it within the act prohibited.

To extend the statute to cover his case can only be done by making an act hitherto legal a *crime*, when it is not made so by the *plain, literal wording* of the statute itself.

To make Mr. Halsted a *criminal* by such a rule of construction would be a direct violation of the whole spirit and intent of the rules applied by the legislature in framing, and by the courts in interpreting *criminal* or *penal* laws.

We cite a few of the many and undisputed authorities on this point. *Fletcher* v. *Lord Sondes*, 3 *Bing.* 579; *United States* v. *Clayton*, 2 *Dill.* 225.

In *Ferritt* v. *Atwill*, 1 *Blatchf.* 156, Betts, Judge, says: "The language of the statute is to be particularly adhered to in the construction of penal laws, and where it has a natural and plain meaning, an artificial or forced one is not to be adopted. 1 *Bl. Com.* 88; *Dwarr. on Stat.* 707–711; *Van Volkenburg* v. *Torrey*, 7 *Cow.* 252.

"Courts will not give an equitable construction to a penal law, even for the purpose of embracing cases clearly within the mischief intended to be remedied. *United States*, v. *Sheldon*, 2 *Wheat.* 119; *Myers* v. *Foster*, 6 *Cow.* 567; *Dagget* v. *State*, 4 *Conn.* 61.

They sedulously limit the action of penal statutes to the *precise cases described in them*, and reject an interpretation tending to comprehend matters not named by the legislature, although analogous. The authorities cited are explicit to this point, and are in unison with numerous others, English and American. *Cone* v. *Bowles*, 1 *Salk.* 205; *Reniger* v. *Fogossa*, 1 *Plowd.* 17; *Fleming* v. *Bailey*, 5 *East* 313; *Rex* v. *Barham*, 8 *B. & C.* 104.

In an indictment under a statute against *transporting* articles of provision from the United States to Canada; *held*—that *driving* of oxen on foot is not a *transportation* thereof within the act. *United States* v. *Sheldon*, 2 *Wheat.* 119; *United States* v. *Wiltberger*, 5 *Wheat.* 96.

*Maxwell on Interp. of Stat.* 240, says: "A strict construc-

tion requires *at least* that no case shall fall within a *penal* statute which does not comprise all the elements which, whether material or not morally, are *in fact* made to constitute the offences *as defined by the statute."*

And see *Bish. on Stat. Crimes*, §§ 190–193, 202, 203, 216–230.

*State* v. *Stimson*, 4 *Zab.* 9, where, at page 30, Green, Chief Justice, says : " The statute is highly penal. It makes criminal acts which are neither *mala in se* nor prohibited by the common law. It must be strictly construed, and its prohibitions be confined within the letter of the act."

*b.* The signing of the bonds.

This act is not so set out in the indictment as to make it available as the basis of a conviction. It is not properly pleaded.

III. The defence offered was a good one, and should have been received and submitted to the jury.

On the trial at the Circuit, the state proved the approval by the defendant of the obnoxious resolutions of December 14th, 1876, and the signing of the debt certificates therein provided for.

No proof was offered tending to show any corrupt motive or purpose, and no pretence of any such was set up.

The defendant's defence as opened was in brief—

That the defendant, being called upon in the line of his official duty to consider and act upon the resolutions in question, performed his duty in the premises in good faith, from pure and honest motives, and according to the dictates of his best judgment and understanding, and therein had exercised due care and caution ; and if in so acting he did anything forbidden by the statute, it was so done through an honest mistake of judgment, in a matter necessarily involving judgment.

Two different committees of the board of freeholders had reported in favor of the purchase in question. Numerous letters and petitions in favor of it had been presented, and no

remonstrances had appeared against it. The board had twice voted in favor of it—the last time by a three-fourths majority. Personally, defendant became convinced it was his duty to approve the resolution, unless forbidden by the statute in question or some other law. On this question he consulted the standing counsel of the board, whom he believed to be honest and capable, and was advised by him that the resolutions, and the debt to be created by them, were not forbidden by, or in violation of the statute in question, or any other statute, and that there was no lawful obstruction to his approving and carrying out the resolution; and from such advice and his own examination of the statute, he became honestly convinced, and entertained the honest opinion that the project covered by the resolutions was a lawful as well as an honest one, and that it was his duty to carry it out. And acting on that honest belief and conviction, he did the obnoxious acts in question.

This defence having been opened, the state moved the court to overrule it and to direct a verdict of guilty, which after argument the court did.

I respectfully submit that the defence offered was a good one, and was improperly overruled.

I. And I observe in the first place, that the defendant was not a volunteer, acting in a private capacity in the assertion or exercise of a private right for his individual benefit, and with no official duty to perform, and not obliged to act at all. On the contrary, his official duty obliged him to act upon the resolutions, and to act according to his best judgment of what his duty in the premises was, and he had no right, from a mere desire to escape all risk and responsibility, to refuse to approve the resolutions and sign the certificates of debt given for the land, if he really believed the project to be a lawful one.

The distinction between the situation of a volunteer and one otherwise situated, is recognized by Depue, Justice, in *Ins Co. v. Kane*, 10 *Vroom* 699.

II. In the second place, the defendant, in determining upon his duty and power in the premises, acted *judicially* and not *ministerially*.

The criterion by which to distinguish between a *judicial* and a *ministerial* act is to be found in the act itself—in the function and not in the office. A judicial officer may act ministerially, and a ministerial officer judicially.

The immunity accorded to judicial acts is accorded to the function, and not to the office.

This distinction runs through all the cases. *Rochester White Lead Co.* v. *City of Rochester*, 3 *Comst.* 463; *Easton* v. *Calendar*, 11 *Wend.* 93; *Weaver* v. *Devendorf*, 3 *Denio* 117, 120; *Vail* v. *Owen*, 19 *Barb.* 26; *Tompkins* v. *Sands*, 8 *Wend.* 466; *Rex* v. *Young*, 1 *Burr.* 556.

III. And, in the third place, the defendant acted in good faith, from honest and pure motives, and from a sincere desire to do his duty, and had no intention to do and was not conscious of doing a forbidden act, having taken all reasonable means to ascertain the quality in that regard of the acts in question.

IV. And, in the fourth place, there was nothing wrong in the acts themselves—no *malum in se*—independent of the statute.

Under these circumstances, I contend that Mr. Halsted cannot be held to be guilty of a misdemeanor.

To so hold would itself be more than a *misdemeanor: it would be a crime*—an infringement of the very first principles of justice; and the reason is that the essential element of every crime is here wanting, viz., an intention to do a forbidden act.

There are some things beyond the power of any legislature, not because they are forbidden by the constitution, but because they are contrary to the first principles of justice and right.

It cannot take your property and give it to me.

It cannot authorize a judgment to be rendered against you for a money demand even, without giving you notice.

It cannot condemn you, or adjudge you guilty of a crime, without notice, and it cannot make that guilt which is not guilt. It cannot alter the essential nature of things.

It cannot declare a man guilty of a penal offence for doing an act which he is unconscious of doing, when the mind does not go with the act.

Defendant here was not conscious that he was doing the act which was forbidden—not conscious that the act which he did was forbidden—and had no intention to do such an act.

He did indeed know of the existence of the law in question; knew that his line of duty brought him sometimes near its confines; felt the pressure of his duty to avoid stepping over those confines, and felt also the pressure of his official duty to act, and to act conscientiously.

So surrounded and so situated, he did the only thing that any honest, conscientious and careful man could do. He took the advice of counsel, on whose judgment he had every reason to rely, and acted upon it.

He was not only entitled to act, but, not being a volunteer, was bound to act *according as it appeared to him at the time.*

The defence of *se defendendo* depends not upon what afterwards turns out to be the true state of facts, but on what honestly appeared to the defendant to exist at the time.

And this brings me to speak of the application of the maxim, *ignorantia legis neminem excusat.*

This is not a case of ignorance of the law.

But of misapprehension of the law as applied to the facts. That is, defendant knew of the existence of the law; he knew, in a general way, what it prohibited; but he did not understand and was not conscious that what he did was so forbidden.

Happily the law of the land declares him, under these circumstances, not guilty.

Now we read these resolutions and we read this law of 1876, and the effect on our minds is quite different, and we begin to reason and compare and exercise judgment to determine whether the resolutions transgress the law, by accomplishing in their results what the law forbids.

Now Mr. Halsted, as director at large, was called upon to decide this question, and I contend that in so doing he acted judicially; but, whether I am correct in that or not, I further contend that, if acting in good faith for proper and honest purposes, and in the exercise of due care and caution, he made a mistake in his construction of the law, he cannot be held criminally liable for such mistake.

I cite the following authorities: *Rex* v. *Jackson*, 1 *T. R.* 653; *Rex* v. *Barratt, Doug.* 449; *Com.* v. *Bradford*, 9 *Metc.* 268; *Com.* v. *Shedd*, 1 *Mass.* 228; *Anonymous*, 2 *East's Pleas of the Crown* 765; *Reg.* v. *Page*, 8 *C. & P.* 122; *Reg.* v. *Allday*, 8 *C. & P.* 136; *Reg.* v. *Tinckler*, 1 *Fos. & F.* 513; *Reg.* v. *Sleep*, 8 *Cox's Crim. Cas.* 472; 7 *Jur.* (*N. S.*) 979; *Hearne* v. *Garten*, 2 *E. & E.* 66; *Rider* v. *Wood*, 2 *E. & E.* 338; *Taylor* v. *Newman*, 4 *B. & S.* 89 (116 *E. C. L.*); *Buckmaster* v. *Reynolds*, 13 *C. B.* (*N. S.,*) 106 *E. C. L.* 62; *United States* v. *Connor*, 3 *McLean* 373.

I also cite *Bish. on Crim. Law*, (*6th ed.,*) *Vol. I.*, §§ 205, 286, 287.

In § 289, he says: "The calm judgment of mankind keeps this doctrine among its jewels. *In times of excitement, when vengeance takes the place of justice, every guard around the innocent is cast down.* But with the return of reason comes the public voice, that where the mind is pure, he who differs in act from his neighbors does not offend." See also §§ 290, 291.

Mr. Bishop discusses the application of the maxim *ignorantia legis neminem excusat*, at §§ 292, 312.

To the same effect, *Bish. on Stat. Crimes*, §§ 132, 239, 355, 358, 359, 361.

It may be urged against this array of reason and authority, that where the forbidden act is not wrong in itself (1 *Bish. on Crimes*, § 295,) there can be, strictly speaking, no "evil intent" in the absence of knowledge of the law, and that as such want of knowledge will not excuse, there is no room for the application of the rule which requires an evil intent, and that it necessarily results *that an entirely innocent person may be properly convicted.*

But this case presents no such question. There was here no ignorance of the existence of the law, but a mistake in its application to the admitted facts of the case; and, without at all attacking the rule that ignorance of the law does not excuse, *we may safely conclude that before a man can be held guilty in a criminal court of a breach of the law, he must have done an act of which he was conscious, supposing him to have known of the law, was a breach of it. He must have been conscious that it came within the category of acts which, when he comes to read the law, he finds to be forbidden by it.* It may be that the law will accept as an evil intent, an intent to do the forbidden act, whether known to be forbidden or not, *but there must be at least such intent,* and what the defence offered to prove in this case was, that there was no such intent, and that the defendant was not conscious of doing, and did not intend to do, the forbidden act.

The case of *State* v. *Cutter*, 7 *Vroom* 125, is in full accord with the foregoing.

It will be seen that Cutter's case was not put on the ground that he was a judicial officer, but on the ground that he made an honest mistake of the law. In fact, the statute under which he was indicted seems to preclude any defence on the ground of judicial immunity. The charge was for exacting an illegal fee and reward for *doing his office.*

The statute of 1876, under which this indictment is framed, and the statute under which Cutter was indicted, are equally silent as to any knowledge or evil intent.

And Justice Van Syckel was only repeating that tribute of praise to the common law which Chief Justice Beasley had previously paid it, when he said that proof " that he-had taken the moneys innocently, under the belief that he had a right to take them," was a proper defence to the indictment, although the statute under which it was framed was silent as to any corrupt purpose or intent. And it is impossible to perceive why, if " a corrupt purpose was essential to make him [Cutter] amenable to indictment," such corrupt purpose was not essential to make Halsted amenable.

A justice of the peace, clothed in a little brief authority, may, for his own private emolument, but through a mistaken notion of the law, extort illegal fees and be acquitted on the ground of mistake of the law. In his case, "the necessities of society do *not* require that men should be held (criminally) for the consequences of their mistakes." But in the case of a director at large of the chosen freeholders of Hudson county, an official charged with important duties and heavy responsibilities, if he shall, in the honest discharge of his duties, and actuated by pure motives and a sincere desire to discharge those duties for the best interests of his employers, in the exercise of due care, and without a cent of personal interest at stake, fall into an honest mistake as to the construction of a new statute, and of his duties and powers under it, then a new rule of responsibility comes in force, a corrupt purpose is not essential, and "the necessities of society do require that he shall be held (criminally) for the consequences of his mistake," no matter how honest and innocent it may have been! Is it possible that the law leads to such a conclusion?

With great respect, I suggest that the true remedy for municipal extravagance lies not in the direction intimated. To surround all kinds of municipal proceedings with numerous so-called guards of penal statutes, and to hold all actual breaches of them guilty breaches, without regard to the question of actual guilt, will tend simply to drive out of office all honest and capable men, and to bring in and educate a class of adroit and adventurous rogues who seek office for what can be made out of it, and take good care to make the profits gained commensurate with the risks incurred; and with that class in power, no penal statutes can be devised which shall suffice to protect the community.

I respectfully submit that the most advanced sentiments of humanity, sound public policy, the fundamental principles of justice demand, and above all, *the law of the land* commands, that the defence offered by Mr. Halsted should have been heard and submitted to the jury; and if it had been, who

doubts that he would have been saved the mortification and partial disgrace of a verdict of guilty ?

For the state, *John P. Stockton, Attorney-General.*

The statute provides " that if any board of chosen freeholders or members of any such board shall disburse, order or vote for the disbursement of public moneys, in excess of the appropriation, respectively, to any such board or committee, or shall incur obligations in excess of the appropriation and limit of expenditure provided by law for the purposes respectively of any such board or committee, the members thereof and each member thereof, thus disbursing, ordering or voting for the disbursement and expenditure of public moneys, or thus incurring obligations in excess of the amount appropriated and limit of expenditure as now or hereafter appropriated and limited by law, shall be severally deemed guilty of malfeasance in office." *Pamph. L.* 1876, *p.* 16.

The offence is disbursing, ordering or voting for the disbursement and expenditure of public moneys, or incurring obligations in excess of the amount appropriated, &c.

And these offences are charged in apt and precise words repeatedly in the indictment. "And did vote for the incurring of obligations, and did incur obligations of the said board of chosen freeholders of the county of Hudson, and did approve the resolution aforesaid, by which said obligations were incurred in excess of the amount appropriated and limit of expenditures as then, or at any time afterwards, appropriated and limited by law for the purpose."

"And did unlawfully vote for the incurring of obligations of said board, and did approve resolutions incurring obligations of said board, and with the assistance of his said vote and approval the said board of chosen freeholders of the county of Hudson, in excess of the amount so as aforesaid appropriated and limit of expenditures so as aforesaid appropriated and limited by law."

"And did unlawfully order the disbursement and expenditure of a large sum of public moneys, to wit, the sum of

two hundred and twenty-five thousand seven hundred and twenty dollars of the moneys of the board of chosen free-holders of the county of Hudson, for the immediate purchase of land upon which to erect a county court-house, in excess of the appropriation to and limit of expenditure appropriated, limited and provided by law for the purpose."

"And did unlawfully incur obligations of the board of chosen freeholders of the county of Hudson, to a large amount, to wit, to the amount of two hundred and twenty-five thousand seven hundred and twenty dollars, for the immediate purchase of land upon which to erect a county court-house, in excess of the appropriation to and limit of expenditure appropriated, limited and provided by law for the purpose."

The act makes him a member of the board in express words. The board of *chosen freeholders* of the county of Hudson, *shall consist* of two chosen freeholders from each assembly district, and also *in addition thereto* a director of said board to be chosen and elected at large; and he shall be presiding officer of said board, shall vote in cases of a tie; that any resolution of the said board affecting the interests of the county, *shall, before it takes effect, be approved in writing by said director.  Pamph. L. 1875, p. 324.*

Now it appears that he is a member of the board, and that as a member of the board in case of a tie he votes, and when he approves he performs a duty which is made his duty under the act as a member of the board.

His salary is different, his title is different, his duties are in some respects different; as his salary is greater so his responsibility is greater, but every duty and every act is done as a member of the board.

There is in parliament a king, lords, temporal and spiritual, and members of the house of commons.  There is in the state senate of New Jersey a president, who is, nevertheless, a senator; the house of assembly elects a speaker; he is nevertheless a member of the assembly, and remains such, and in various municipal bodies in England and this country there are

various orders and degrees among the members, with by-laws assigning duties to the different degrees of members; they are, nevertheless, all members. If Halsted was a member, there can be no dispute that his approval of the resolutions incurring obligations was given as a member.

He is charged with incurring obligations, with voting and approving the resolutions, signing the obligations in pursuance of the resolutions he approved, and ordering the disbursement and expenditure of a large sum of money, all of which acts were done by him in his position as director, and, as such, one of the members of which the board was made by the act to consist.

He had power to refuse to approve the resolution, and in that respect the member known as a director at large had more power and more responsibility than the others, and for that reason is more to blame than the others.

The Supreme Court in case of *State* v. *Halsted et al.*, 10 *Vroom* 403, in a decision which has not been disputed or controverted, held that "under the act of February 7th, 1876, (*Pamph. L.* 1876, *p.* 16,) members of said board of freeholders are indictable for passing, December 14th, 1876, a resolution to purchase property, and for issuing, in payment therefor, bonds to the amount of $225,000, payable out of the amount appropriated for the fiscal year from December 1st, 1877, to December 1st, 1878, no appropriation having been made for that year, and no power existing in the members of said board to make such appropriation.

"Where a statute specifically defines what acts shall constitute a misdemeanor, it is sufficient in the indictment to bring the defendant within the statutory description of the crime."

*First.* So we have it admitted in the case before us that all the members of the board of freeholders did, as a matter of fact, violate the provisions of the act.

*Second.* That they were properly charged by that indictment.

*Third.* We have shown that the present indictment varies only from the omnibus indictment which was then before the court in this, that it charges him as director.

*Fourth.* That the director is a member of the boaad, and properly charged.

It appears by the charge of Judge Knapp, that he said to the jury, "The case for the state is established by the proof that is introduced ; the facts show that Mr. Halsted's approval of this resolution for the issuing of the bonds payable in 1877–8 establishes the guilt of the defendant in the absence of any defence."

The whole question now submitted to this court although presented in various shapes is simply this, whether Judge Knapp erred in overruling the defence that the *act was done without a guilty mind.*

I find it stated more concisely than anywhere else in the offer of the defendant's counsel, as follows: "Also, that the defendant carefully examined into and considered his duty and powers and liabilities in approving or not approving of said resolutions, and took the opinion and advice of the counsel as aforesaid, and in the exercise of his best judgment in good faith, aided and assisted by the opinion and advice of the counsel as aforesaid, upon which he in good faith relied, and in the correctness of which he believed, approved of said resolution, believing that he had the lawful right, and that it was his duty so to do."

I. *It is competent for the legislature to make the commission or omission of any act criminal, irrespective of the intent or motive with which it was done ; and in such cases neither ignorance of law nor of fact can be successfully pleaded as a defence.*

The court below properly refused to admit the defence, which was simply a proposition to prove that the defendant did not act from a bad motive, but was advised by counsel that his conduct was not a violation of the terms of the act. It is true that counsel have attempted to draw a distinction between ignorance of the law and misapplication or misconception of the law. They admit that he was not ignorant of the law, that the acts charged were done knowingly and intentionally, but insist that, if he could prove that counsel advised him that, according to his construction of the statute, the act contemplated would not be indictable, that that circumstance

relieves him from all responsibility. This suggestion, it is insisted, is not new, but was covered by the argument and decision in the motion to quash, that the knowledge of the law which is presumed is a correct knowledge of the law.

The position assumed by the defence would prevent the prosecution of any indictment by the presentation of an opinion of counsel that the act was not indictable, and virtually is nothing but the reiteration of the plea, ignorance of the law excuses; and so immunity would depend upon the ability to procure the opinion of counsel, and the prerogative of the court would soon be usurped by counsel who might be retained for that purpose.

The defence offered is more like the following than any of the cases cited, viz. : Suppose a statute enacts that in order to prevent danger to peaceable citizens it shall not be lawful to carry firearms in the streets of a city; an indictment charges defendant with carrying firearms in violation of the statute; he offered to prove that he carried a certain weapon which, in the opinion of counsel obtained for a purpose, was not within the proper definition of firearms—that it was an air gun, or that the missile was propelled by some other contrivance than fire. If the court should be of the opinion that the weapon was embraced in the definition of firearms, could the defendant be acquitted on the ground that his counsel did not agree with the court ?

A review of the authorities and cases cited will show that neither the cases nor authorities apply to statutory offences, where no motive is made an element of the offence, and when the act was intentionally done, knowing that it was the act described in the indictment, and the defence offered was simply a want of certainty as to the application of the statute to the act complained of, or the opinion of counsel that the commission of the acts complained of would not be in violation of the statute. The cases cited in defendant's brief are cases where the defendant did not intend to do what he did, and was therefore ignorant of the facts, or else they were cases where the intention to violate the law would not be presumed, but

in this case the defence offered admits, throughout, knowledge of the act complained of and all the facts necessary to show that the defendant knew precisely what he was doing; that he was put on inquiry as to its legality, and deliberately did the acts in violation of the law which he was presumed to know, thereby voluntarily assuming the risk of the true construction of the law.

Justice Van Syckel, in the case of *State* v. *Halsted et al.*, 10 *Vroom* 411, lays down the rule as follows: " By the terms of the statute upon which this indictment is framed, guilty knowledge or corrupt intent forms no part of the act which is declared to be indictable. ' The indictment, therefore, conforming to the language of the statute, is good, without averring that the forbidden act was done corruptly. The distinction is between cases where a legislative act forbids a ministerial officer to do an act which, by reason of such prohibition, becomes indictable at common law, and cases where the act specifically defines what shall be indictable."

" In the former case, under the common law, allegation of corruption is essential; in the latter it is otherwise. 1 *Whart. Cr. Law*, § 297, and cases cited ; 2 *Bish. Cr. Proc.* 834.

" When an act is declared to be unlawful, and is expressly made indictable, an evil intent will be presumed in its commission, and need not be averred.

" Corruption in the exercise of official functions is indictable in the absence of the statute.

" It is, perhaps, safe to say that in all cases where a statute creates an offence and mentions some intent as an element therein, the indictment must follow the statute, and specify the intent; but if the statute is silent concerning the intent, there need be no allegation of intent in the indictment. 1 *Bish. Cr. Proc.* 523, and notes."

Every point suggested in this case by way of defence was recently before the Court of Appeals in the State of New York, in the case of *Gardner et al.* v. *People of the State of N. Y.*, 62 *N. Y.* 299. The opinion was delivered by Chief Justice Church. He says :

" When the act thus prohibited is intentionally done, it is a misdemeanor irrespective of the motive or intent. It is no defence, therefore, upon the trial of an indictment therefor, that the accused acted in good faith, and under legal advice, that they had a right to remove without notice. A mistake of law does not excuse the doing of a prohibited act."

The whole case is directly in point, and supports the opinion of this court delivered in *State* v. *Halsted,* 10 *Vroom* 403.

Mr. Francis Wharton, in an able article published in the *Albany Law Journal* of Saturday, February 5th, 1879, page 84, entitled " Ignorance as a Defence," says :

" That ignorance of law is no defence is generally admitted. A conspicuous illustration of this is to be found in the case of Miss Anthony, who was convicted a short time since in New York of illegal voting. She set up as a defence that she believed that she was in law entitled to vote, and that she had been so advised by competent authorities. This was held not to avail her, and under Judge Hunt's express directions she was convicted." *United States* v. *Anthony,* 11 *Blatchf.* 200 ; *United States* v. *Taintor,* 11 *Blatchf.* 374.

Similar rulings have been maintained in other jurisdictions. *Hamilton* v. *People,* 57 *Barb.* 625 ; *State* v. *Boyett,* 10 *Ired.* 336 ; *State* v. *Hart,* 6 *Jones* (*N. C.*) 389.

No defence on indictment for adultery, that the defendant believed she had been legally divorced. *State* v. *Goodenow,* 65 *Me.* 30.

And even a conscientious belief that an act is right—labor by a Jew on Sunday in contravention of the Sunday laws. *Com.* v. *Has,* 122 *Mass.* 40 ; *Specht* v. *Com.,* 8 *Penna. St.* 312.

Ignorance of fact, however, presents questions far more intricate ; and as to this defence we may lay down the following propositions :

*First.* When to an offence knowledge of certain facts is essential, then ignorance of these facts is a defence.

*Second.* When a statute makes an act indictable, irrespective of guilty knowledge, then ignorance of fact is no defence, viz. :

Halsted v. State.

Of this last proposition the following illustrations may be given :

To an indictment for bigamy, it is no defence that the defendant, a woman, honestly believed (within the limit of seven years from the time he was last heard from) that her husband was dead. So has it been ruled in Massachusetts. *Com.* v. *Mash,* 7 *Metc.* 472; *Com.* v. *Elwell,* 2 *Metc.* 190.

In England decisions to the contrary were given before the law was thoroughly considered, by single judges. *R.* v. *Turner,* 9 *Cox's Crim. Cas.* 145; *R.* v. *Horton,* 11 *Cox's Crim. Cas.* 670.

But these decisions have now been summarily and finally overruled. *R.* v. *Gibbons,* 12 *Cox's Crim. Cas.* 337.

And an indictment has been sustained in Massachusetts against a man for marrying a woman who believed herself to be a widow, although eleven years had elapsed since she had last seen or heard from her husband, whom she had left. *Com.* v. *Thompson,* 6 *Allen* 591; *Com.* v. *Thompson,* 11 *Allen* 23.

It being held by the court that the statutory exceptions do not apply to the deserting party. It has been further held, that when a guilty party in a divorce suit marries again without leave of court, (this being legally essential,) during the life of the other party, and afterward obtains such leave, an honest belief that the second marriage is or has become legal, has no effect in making it so, and in protecting the parties. *Thompson* v. *Thompson,* 114 *Mass.* 566.

Numerous illustrations to the same effect may be drawn from prosecutions for invasions of the laws making indictable the sale of liquors under certain conditions. It is no defence, for instance, to an indictment for keeping or selling adulterated or intoxicating liquors, that the defendant did not believe them to be intoxicating or adulterated. *R.* v. *Woodrow,* 15 *M. & W.* 404; *Com.* v. *Farren,* 9 *Allen* 489; *Com.* v. *Nicols,* 10 *Allen* 199; *Com.* v. *Smith,* 103 *Mass.* 444; *State* v. *Smith,* 10 *R. I.* 258; *People* v. *Zeiger,* 6 *Park. Cr. Rep.* 355.

Thus, on an indictment for selling adulterated milk, the

defendant is not protected by ignorance of the adulteration, or even by the belief that the milk was pure. *Com.* v. *Farren*, 9 *Allen* 498; *Com.* v. *Waite*, 11 *Allen* 264; *State* v. *Smith*, 10 *R. I.* 258.

And the same rule applies to indictments for selling intoxicating drinks. *Com.* v. *Boynton*, 2 *Allen* 160; *Barnes* v. *State*, 19 *Conn.* 398.

In several states, selling liquors to minors is indictable by statute, and in such cases, also, arises the question whether the defendant knew that the vendee was a minor. Here, again, we have the rule before us applied, it having been repeatedly held that ignorance in this respect, coupled even with an honest belief that the vendee was of full age, is no defence. *United States* v. *Dodge*, 1 *Deady* 186; *Com.* v. *Goodman*, 97 *Mass.* 117; *Com.* v. *Emmons*, 98 *Mass.* 6; *Com.* v. *Lattinville*, 120 *Mass.* 385; *Com.* v. *Finnegan*, 124 *Mass.* 324; *Barnes* v. *State*, 19 *Conn.* 398; *McCutcheon* v. *People*, 69 *Ill.* 601; *Farmer* v. *People*, 77 *Ill.* 322; *State* v. *Hartfiel*, 24 *Wis.* 60; *State* v. *Cain*, 9 *W. Va.* 572; *Ulrich* v. *Com.*, 6 *Bush* 400; *State* v. *Hause*, 71 *N. C.* 518; *aliter* under Georgia and Indiana statutes; *Stern* v. *State*, 53 *Ga.* 229; *Brown* v. *State*, 24 *Ind.* 113; *Farbach* v. *State*, 24 *Ind.* 77; *Goetz* v. *State*, 41 *Ind.* 162.

It is also no defence to an indictment for selling to persons of intemperate habits, that the defendant did not know that the vendee was of intemperate habits. *State* v. *Heck*, 23 *Minn.* 594; *Farmer* v. *People*, 77 *Ill.* 322.

Though it is otherwise when the statute makes the offence to be selling to persons of " *known* " intemperate habits, in which case knowledge is an ingredient of the prosecutor's case. *Smith* v. *State*, 55 *Ala.* 1; *Crabtree* v. *State*, 30 *Ohio St.* 382.

Analogous cases have arisen under statutes making it indictable to abduct, seduce or violate girls under a specific age. Here, also, it is no defence that the defendant mistook the girl's age. *R.* v. *Booth*, 12 *Cox's Crim. Cas.* 231; *R.* v.

*Olifier*, 10 *Cox's Crim. Cas.* 402; *R.* v. *Robins*, 1 *C. & K.* 456; *State* v. *Ruhl*, 8 *Iowa* 447.

We have recently had a signal illustration of this application, where the rule was affirmed by the great majority of the English judges. The defendant was convicted under 24 and 25 *Vict.* of unlawfully taking an unmarried girl under sixteen years out of her father's possession, and against his will. It was proved by the defendant that he *bona fide* believed, and had reasonable ground for believing, that the girl at the time of the act was over sixteen. Cockburn, Chief Justice; Kelly, Chief Baron; Bramwell, Cleasby and Amphlett, Barons; Blackburn, Mellon, Lush, Grove, Quain, Denman, Archibald, Field and Lindley, Justices, held that the defence was of no avail, and that the conviction was right. The sole dissentient was Brett, Justice. A similar ruling is to be found in the Iowa reports. It has been held in that state that knowledge that a child is under ten years is not necessary to convict a defendant of the statutory offence of assaulting a child under ten years. *State* v. *Newton*, 44 *Iowa* 45.

And it has been held in Missouri that it is no defence to a suit for marrying minors that the defendant believed them to be of full age. *Beckham* v. *Nacke*, 56 *Mo.* 446.

In other lines of prosecutions under statutes making acts indictable, irrespective of intent, similar conclusions have been reached. Thus, it is no defence to an indictment for betting at a gaming-house, that the defendant believed that the house was licensed. *Schuster* v. *State*, 48 *Ala.* 199.

Nor to an indictment for selling a calf under the statutory age, that the defendant did not know that the calf was below the limit. *Com.* v. *Raymond*, 97 *Mass.* 567.

Nor to an indictment for carrying an illegal number of passengers, that the defendant did not know that there was an excess. *State* v. *Balt. Steam. Co.*, 13 *Md.* 181; though see *Duncan* v. *State*, 7 *Humph.* 148.

Nor to an indictment for selling naphtha, that the defendant did not know that the oil was naphtha. *Com.* v. *Wentworth*, 118 *Mass.* 441.

Nor to an indictment for illegally usurping an office, that the defendant honestly believed that he was honestly elected to the office. *State* v. *Hallett*, 8 *Ala.* 159 ; *McGuire* v. *State*, 7 *Humph.* 54 ; *State* v. *Hart*, 6 *Jones (N. C.)* 389.

With these rulings may be classed the well-known common law principle, that it is no defence to an indictment for a libel that the defendant was ignorant of the contents of the libel. *Curtis* v. *Mussey*, 6 *Gray* 261 ; *People* v. *Wilson*, 64 *Ill.* 195.

Or that his motives were scientific or philanthropic. *R.* v. *Hicklin*, *L. R.*, 3 *Q. B.* 360.

The motive may affect the grade of the offence, or the extent of the punishment, but the existence of a crime is, in such cases, dependent upon the doing of, or omitting to do, an act, and not upon the motive which led to the omission or commission. Thus the law prohibits the destruction of the life of any human being without lawful authority for so doing, and if human life is destroyed without lawful authority, the party doing or causing that destruction is punishable, no difference what his motive was. If it is done with malice, it is murder ; if the injury was unintentional, as the result of carelessness, it is manslaughter. 1 *Whart. Crim. Law*, § 1011.

The motive only affects the degree of the crime, and the degree is important only in respect of the kind, measure and extent of the punishment to be inflicted. *"The Mary Ann,"* 8 *Wheat.* 380.

Take, also, the fifth and tenth sections of the *habeas corpus* act. If a judge deny a writ of *habeas corpus* when demanded according to law, or an officer or other person to whom it is directed, does not obey it according to the statute, he is subject to a heavy penalty, and no one will pretend that the declaration need aver that the non-performance of duty proceeded from a corrupt motive. To the injured party the motive of the defendant is immaterial and unimportant.

There are many crimes the existence of which in no way depends upon a corrupt motive. Such are escapes voluntarily permitted by officers. *Rev.*, *p.* 123, §§ 8, 9. Omitting to give notice of certain high crimes by one having knowledge

of the actual commission thereof. *Rev., p.* 128, § 21. Voting, by one who has been disqualified from voting by conviction for a disfranchising crime. *Rev., p.* 131, § 26. Illegal voting. *Rev.,* §§ 27, 28, 29.

In almost every crime which is perpetrated by forcible violence, except robbery and burglary, a corrupt motive is no essential part of the crime. The same is true of many of the crimes against public morals and of most of the crimes against personal liberty and the governments, local and general.

The defence did not offer to prove ignorance of law or fact, but simply insisted that misapprehension of law, under the advice of counsel, was a good defence to a charge against a public officer violating the express prohibition of the act.

The knowledge of the law which is presumed is a correct knowledge of the law.

Judge Van Syckel says, in commenting on the case of *Cutter* ads. *State,* 7 *Vroom* 125, that it cannot be used as an authority to overthrow the accepted doctrine that ignorance of the law is no excuse for crime.

II. *It is competent for the legislature in creating a public municipal office to attach to it the burden of criminal responsibility for the omission to fulfil any of its duties, whether that omission arose from an evil mind, negligence, slothful disposition, want of comprehension of its duties, or ignorance of law or fact.*

The person accepting such position, taking the oath of office, receiving the emoluments thereof, guarantees his capacity as well as his honesty, activity and intelligence.

It is insisted as a defence that he was not a volunteer; but it must be remembered that he was paid a large salary to prevent obligations being incurred in excess of the appropriations. He held himself out as one competent to perform this duty; if he has failed in doing so it is no fault of the public, but the result of his own negligence or incompetency.

The whole defence in this case results in this proposition,

that it is beyond the power of the legislature to create an offence which shall be completed without a guilty mind; that it is beyond the power of the legislature when it creates a public office, attaching to large emoluments and important public duties, to add the burthen of an entire responsibility of the incumbent for the full performance of the duties, without regard to motive or intent. This principle would deprive the legislature of the power of making the treasurer of the state absolutely responsible for all moneys intrusted to his care, when there can be no question that the legislative body has the power, if it sees fit to exercise it, to attach to such an office the burden of making the incumbent the guarantor of all money coming into his hands.

The only crime charged is the failure to fulfil the obligation of the statute; the only penalty is that which the statute attaches to such failure. It is no defence that no wrong was intended, or that the defendant was ignorant of or misconstrued the law.

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. It appears by the record in this case that at a meeting of the board of freeholders of the county of Hudson, on the 27th of June, 1876, a resolution was adopted fixing the tax to be raised for county purposes for the fiscal year commencing on the 1st of December, 1876, at $600,000; and that afterwards, at a meeting on the 14th of December, 1876, a resolution was passed, directing the purchase of a certain site for a court-house, at a price amounting in the aggregate to $225,000; and that, in payment of said lands, a bond or bonds of the county of Hudson should be issued, payable out of the amount to be appropriated and limited for the expense of the next fiscal year, being the fiscal year commencing on the 1st day of December, 1877, such bonds to run one year and to bear interest at the rate of seven per cent. per annum. The indictment further shows that a conveyance for the land above mentioned was duly made,

and the bonds of the county conformably issued in payment therefor.

It is insisted by the counsel of the defendant, that admitting that such defendant was a member of the board of freeholders, it does not appear from these facts that he committed an indictable offence. This contention puts in question the meaning of the supplement to the crimes act, approved February 7th, 1876.

I have found it somewhat difficult to realize that any disinterested person, upon a careful reading of that statute, can have any doubt with respect to the legislative purpose as expressed in its language. By the general law the board of freeholders ascertain, before a certain date, the amount of tax necessary for county purposes for such year, and the manifest purpose of this supplement was to require the freeholders to make all payments during the year out of that fund, or out of moneys in hand, and to contract no obligations that were not to be so paid. Unless the act means this it has no sensible meaning. The provision, as a practical refutation, becomes absurd, if we give to it a signification that will support this defence, because although it is intended as a circumscription of official authority, it has no force whatever in that direction, for these boards, upon such a theory, can contract what debts they please, provided they make such debts payable out of a future assessment. No uncertainty in this respect has been perceived by me. The offence is committed whenever one of these boards, or any member of any one of them, "shall disburse, order, or vote for the disbursement of public moneys in excess of the appropriation respectively, to any such board or committee, or shall incur obligations in excess of the appropriation and limit of expenditure provided by law for the purposes respectively of any such board or committee," &c. Here, then, is a clear prohibition against incurring any obligations in excess of "the appropriation and limit of expenditure." In this case the board's appropriation was $600,000, and the freeholders incurred this debt of $225,000 in addition to such appropriation, because they provided, in express terms, that it should

not come out of such fund. By the terms of the bonds issued by the board this additional sum was not to fall due during the current fiscal year; and by the express terms of the resolution the debt so evidenced was to be paid, not out of the $600,000 in their hands, but out of the levy of taxes to be made the next fiscal year. By such an arrangement the whole $600,000 were left in their hands, untouched and unaffected by this obligation; and such fund, if left unused by them, and although it should have been passed by them to their successors in office, was not to be devoted to the payment of the debt in question. This regulation is so plain that it is difficult to comprehend how any person, not under a misleading bias, can fail to understand that all attempts, no matter by what device, to carry over by a new engagement debts falling due in the current year, or debts created during such year, to a subsequent year for payment, is in direct conflict both with its terms and spirit. The system clearly defined here is, that a certain fund is provided for all the expenses and disbursements and obligations to be incurred during the current year, and that every obligation or debt incurred during such year is to be paid out of the fund so provided, and that all debts incurred which are to be paid out of a fund to be raised in the future is in excess, or what is the same thing, is in transgression of the limit of expenditure established by law. I entirely concur in the view taken on this subject in the Supreme Court, and am of opinion that this assignment of errors cannot avail the defendant.

Next it is urged that the defendant was not, in a legal sense, a member of the board of freeholders, and therefore he is not within the compass of this statutory provision. The argument is that the director of the board is not a member of the board, the reasons being that he has no vote, except when there is a tie, that his salary is greater, and that there are sundry expressions in the act that seem to indicate that his is a separate and independent office. I shall not attempt to criticise these details, for it would involve a discussion of minutiæ which I cannot consider of much importance, and which I

think are entitled to no weight at all in the presence of the provision of this law, which, in set terms, describes the constitution of this board, and which clearly makes the director a part of it. The section referred to provides that this board of chosen freeholders "shall consist of two chosen freeholders from each assembly district, and also in addition thereto a director of said board to be elected and chosen at large for two years, from the county of Hudson. * * * The director at large * * * shall be the presiding officer of said board," shall appoint all committees, "but shall have no vote in said board except in case of a tie. * * * Every resolution of the board * * * shall, before it takes effect, be approved in writing by said director." In a legal sense I regard all persons, no matter what their denominations may be, who are necessary constituents of the board, members of it, and the statute in express terms declares that the board shall *consist* of a director and of the other chosen freeholders.

And in this connection I will dispose of the kindred objection that this defendant did not either "order or vote for" the contracting of this obligation, with the remark that by signing the resolution to incur it, and the bonds by which it was carried into execution, I think, within the meaning of the act, he did officially participate in the incurring of this obligation.

On these points I have found no difficulty.

The next objection relates to the overruling at the trial of certain exculpatory facts.

When the state had closed, the defence offered to show that the defendant, in aiding in the passage and effectuation of the resolution which I have pronounced to be illegal, did so under the advice of counsel, and in good faith, and from pure and honest motives, and that he therein exercised due care and caution. The arguments upon this interesting topic, contained in the briefs of the respective counsel, marked, as such briefs are, by acute reasoning and copious learning, have been of much assistance in the examination of the subject.

On the part of the defence, it is strongly urged that the defendant was not a volunteer in this affair; that he was

bound, under the obligations of public duty, to decide and act in the premises, and that if he acted with an honest purpose, and with due circumspection, to hold him guilty under this law would be contrary to those essential principles of justice and public policy on which all law is founded. To enforce this view, we are referred to those general maxims of criminal law which have been so often repeated by judges, and which are so well summarized by Mr. Bishop in the first volume of his work on Criminal Law, section two hundred and five, to the effect, "that in no one thing does criminal jurisprudence differ more from the civil than in the rule as to intent. Crime proceeds only from a criminal mind." Looked at in this light, and in this general aspect, the position of the defence is well calculated to strike the mind with great force, for we have there as the elements of the juncture that the defendant was honest, that he acted with caution, and that he was compelled to act, so that his violation of law was an unavoidable resultant from a discharge of duty, in its best form. It is, therefore, urged that the result is that the rule of law that will convert the defendant into a criminal is a rule that must inevitably, on many occasions, lead to the inculpation, by force of the criminal law, of this class of officials if they discharge their duty faithfully.

But it will be observed that the principle that infuses life into this line of argument is too broad to be assented to in its full extent. Nothing in law is more incontestable than that, with respect to statutory offences, the maxim that crime proceeds only from a criminal mind does not universally apply. The cases are almost without number that vouch for this. The defendant in this case pleads that he was ignorant of the law as applied to the facts involved in his conduct. But it has been many times decided, and indeed is the admitted general rule, that ignorance of the law is no defence against a criminal charge. Mr. Wharton, in an article published in the *Albany Law Journal* on February 5th, 1879, page thirty-four, says "that ignorance of law is no defence is generally admitted."

Mr. Broom, in his Legal Maxims, thus clearly delineates

the legal doctrine: "It is," says Lord Kenyon, "a principle of natural justice, and of our law, that the intent and the act must both concur to constitute the crime." "A man," as remarked by Earle, Chief Justice, "cannot be said to be guilty of a *delicit*, unless, to some extent, his mind goes with the act. And the first observation which suggests itself in limitation of the principle thus enunciated, is that whenever the law positively forbids a thing to be done, it becomes thereupon *ipso facto* illegal to do it wilfully, or, in some cases, even ignorantly, or, maybe, to effect an ulterior laudable object, and consequently the doing of it may form the subject matter of an indictment, or other legal proceedings *simpliciter*, and without the addition of any corrupt motive."

· In the case of *State* v. *Goodenow*, 65 *Me.* 30, it was decided, on an indictment for adultery, that the defendant could not defend on the plea that she believed that she had been legally divorced. And, in like manner, it is easy to cite cases establishing the doctrine beyond dispute or cavil, that in many cases an honest mistake in regard to a state of facts will not exculpate when the prohibition of a statute has been violated. As an illustration, I will refer to *Reg.* v. *Woodrow*, 15 *M. & W.* 404, which was an information against a retailer of tobacco, for having in his possession adulterated tobacco; and it was held that he was punishable, although it was shown that he had purchased it as genuine, and had no knowledge or cause to suspect that it was not so. Another example is presented in *Commonwealth* v. *Mash*, 7 *Metc.* 472, which was the case of a woman marrying after her husband had been absent for several years, in the honest belief that he was dead; such defence being disallowed. But on this head it is not necessary to multiply authorities. A crowd of them are collected in the brief of the attorney-general, and in fact it is admitted by the counsel of the defence that in a large number of instances of statutory offences, the crime may be committed in the absence of any wrongful intent. Nor even with respect to the common law is it true that a guilty purpose, or the possession of the knowledge requisite to make

the mind guilty with respect to a particular act, is an essential part of criminality. It is settled in that system by indubitable authority, that a statute may be violated by a person so soon after its passage that the fact of its enactment could not by possibility have come to his knowledge. Judge Story, in one of his decisions, recognizes this as an established principle of the common law, and applies it to the issue before him.

But, on the other hand, it is equally undeniable that in some cases, when the prohibition in a statute against doing a certain act, or series of acts, is couched in general terms, courts have, to use the language of Lord Cockburn, imported into the statute a proviso that the denoted act shall be done from a guilty mind. Such was the case of *Rider* v. *Wood*, 2 *E. & E.* 338, which was an information against the defendant for unlawfully absenting himself from the service of his employer during the term of his contract of service, contrary to a statute, the proceeding being founded on a law which enacted that if any servant, &c., " shall contract with any person or persons to serve him, &c., for any time or times whatsoever, and having entered into such service, shall absent himself or herself from his or her service before the term of his or her contract shall be completed, the person so offending may be committed," &c. The defendant having absented himself from the service contracted for by him, under the honest belief that a notice that he had served had legally dissolved the contract, the court held that he could not be convicted if he had given the notice in good faith, and believed in its legal efficacy, although in point of law such notice was a nullity. This is manifestly a clear case in which the court held that the culprit must have had a guilty mind, although such ruling had the effect of qualifying the general statutory language. There are other cases in the same line cited in the briefs.

Now these two classes of cases, diverging as they do, and seemingly standing apart from each other, may at first view appear to be irreconcilable in point of principle; but, nevertheless, such is not the case. They all rest upon one common ground, and that ground is the legal rules of statutory con-

struction. None of them can legitimately have any other basis. They are not the products of any of the general maxims of civil or natural law. On the contrary, each of this set of cases is, or should have been, the result of the judicial ascertainment of the mind of the legislature in the given instance. In such investigations the dictates of natural justice, such as that a guilty mind is an essential element of crime, cannot be the ground of decision, but are merely circumstances of weight, to have their effect in the effort to discover the legislative purpose. As there is an undoubted competency in the law maker to declare an act criminal, irrespective of the knowledge or motive of the doer of such act, there can be, of necessity, no judicial authority having the power to require, in the enforcement of the law, such knowledge or motive to be shown. In such instances the entire function of the court is to find out the intention of the legislature, and to enforce the law in absolute conformity to such intention. And in looking over the decided cases on the subject it will be found, that in the considered adjudications, this inquiry has been the judicial guide. And naturally, in such an inquiry, the decisions have fallen into two classes, because there have been two cardinal considerations of directly opposite tendency, influencing the minds of judges; the one being the injustice of punishing unconscious violations of law, and the other the necessity, in view of public utility, of punishing, at times, some of that very class of offences. All the cases that are pertinent that are relied upon by the counsel of the defendant in this case, are decisions that have been produced mainly under the influence of the former of these two classes of considerations, but they are all, nevertheless, mere constructions of the respective statutory enactments. These citations are made with a view to show that as a general rule the courts will require a corrupt motive to be shown when the statutory denunciation against doing an act contains no such requisition. But the authorities vouched do not sustain that large proposition; they simply evince that in those special instances in construing the respective enactments, a legislative purpose was

perceived of requiring, to constitute the offence, a mind conscious at the time of wrong doing. The decisions thus adduced are not many; some of them are not apposite to the question; and none of them can be said to sustain the proposition that in cases where a statute in general terms prohibits the doing of a particular act, the court will interpolate into such statute the requirement of a corrupt motive as an ingredient of the offence, on the sole ground that otherwise it would be opposed to natural justice. For a moment I will turn my attention to these cases, to see how far they sustain the proposition above stated, or the kindred proposition that a misapprehension as to the legal application of a statutory prohibition will excuse its infringement. The two cases of *Rex* v. *Jackson*, 1 *T. R.* 653, and *Rex* v. *Barrat, Doug.* 449, have no relevancy, as they were motions for informations, and were therefore applications addressed to the discretion of the court. The next case is that of *Commonwealth* v. *Bradford*, 9 *Metc.* 268, in which the indictment was for illegal voting, but it can have no appreciable bearing upon the present inquiry, for although it was indeed held that a mistake with reference to the law might be proved, it appeared that the statute alleged to have been violated, made a knowledge of the law a component part of the offence. The act imposed a penalty on a person who should vote " knowing himself not to be a qualified voter;" and the court sanctioned the admission of evidence tending to show an honest error as to the law. I·do not think that it is to be questioned that where a corrupt purpose or guilty knowledge is a part of the crime, ignorance of the law may be shown. The recent case of State *v.* Noyes was affected by such a circumstance, and the defendant was permitted to show, in repulsion of the charge of fraud, that he was honestly mistaken as to the law and that he acted under the advice of counsel. In the present case, if this act of 1876 had declared that if any member of the board of freeholders should corruptly contract a debt in excess of the prescribed limit, there would not upon this point have been any question worthy of a moment's discussion. The

next case, which is that of *Commonwealth* v. *Shedd*, 1 *Mass.* 228, is subject to this same criticism.

The next case is the anonymous one taken from 2 *East P. C.* 765, and it, with respect to its enactment, was this: A statute made it an indictable offence for any person to have in his possession any canvas stamped with the king's mark, unless such person had a certificate of an officer of the crown showing how such article came into his possession. The defendant, who was a woman, was found with such a piece of canvas in her possession, and had no certificate showing how it came to her. On the trial it appeared that the defendant's husband had purchased it in his lifetime at a public sale by the officers of the navy, and had used it in the family, and that it had been left in the house at his death, and that no certificate appeared to have been taken at the sale. It was obvious that the defendant was morally not guilty and the court pronounced her legally not guilty. As far as appears there was no attempt to put any construction on the statute, derived from its language or the object at which it aimed, but the case as reported was disposed of by the remark made apparently to the jury, that "if the defendant's husband really bought the linen at public sale, but neglected to take a certificate, or did not preserve it, it would be contrary to natural justice, after such a length of time, to punish her for his neglect." This as an observation to the jury would not be out of the way, but as lapse of time could have nothing to do with the matter in its legal aspect, it would be an improbable conclusion to infer that the judge in these expressions was assigning his grounds for holding this law inapplicable if the defendant's possession of this article was unconsciously wrongful. But I do not think this case, from extrinsic considerations, of much force as a precedent. It is true that the judgment is said to have been rendered, under the circumstances stated, by Judge Foster, who in his day was eminent for his learning, especially in the field of criminal law, but the case is not taken from the well-known volume entitled "Foster's Reports," and which was prepared and published by the judge

himself, but from the appendix added by another hand to the third edition, and which appendix is of no authenticity, for we are informed by Mr. Dodson, in his life of Judge Foster, that this appendix contains matters which the judge, by the advice of Lord Mansfield and Lord Hardwicke, had himself suppressed. I also observe that in the preface to his own edition this venerable magistrate says that he is about to submit a few crown cases in which he had taken a share, and that his other notes "are too crude and imperfect to admit of publication," and yet it is from these notes that the appendix in question has been composed. It seems to me this case is of little account. Moreover, it is highly probable that it was, in point of fact, put on the same ground with *Reg.* v. *Sleep,* 8 *Cox's Crim. Cas.* 472, which is another authority cited for the defence, and which was the case of a person indicted under the same statutory provision for having in his possession certain copper marked with an arrow, denoting that it had formerly belonged to the government. The jury having found that the evidence was insufficient to show that the copper was thus marked, Cockburn, Chief Justice, and his associates adjudged that there could be no conviction, the Chief Justice saying that "the ordinary principle that there must be a guilty mind to constitute a guilty act applies to this case, and must be imported into this statute, as was held in *Reg.* v. *Cohen,* 8 *Cox's Crim. Cas.* 41, where this conclusion of law was stated by Hill, Justice, with his usual clearness and power." It will be perceived that the Chief Justice does not attempt to justify the implication made by him, except by the reference to the judgment of Hill, Justice, in the case named, so that we are constrained to refer to that decision for explanation, and by doing so, we find the enactment in question is expounded in the usual way by a reference to its context and its effects, and the conclusion arrived at that unless the adjudged interpretation should be adopted the act would be run into absurdity. No one can doubt that, granting these judicial premises, the conclusion was in harmony with ordinary rules.

The remaining cases cited, *Reg.* v. *Tinkler*, 1 *Fos. & F.* 513; *Hearne* v. *Garten*, 2 *E. & E.* 66; *Rider* v. *Wood*, 2 *E. & E.* 338; *Taylor* v. *Newman*, 4 *B. & S.* 89; *Buckmaster* v. *Reynolds*, 13 *C. B.* (*N. S.*) 62, and *United States* v. *Connor*, 3 *McLean* 573, are all decided on the same principle that was applied in the last case just specially noticed. It is in this class of decisions that the case of *State* v. *Cutter*, 7 *Vroom* 125, is to be included.

These cases have been specially referred to by me, with the purpose of illustrating by examples the conclusion already expressed, that the subject under consideration is completely embraced in the legal department of statutory construction, and that each decided case rests on its own facts and particularities, and that the maxim, "*actus non facit reum nisi mens sit rea,*" has no controlling effect. That this maxim has, and should have, in every doubtful case a decided influence, is not denied; but it is intended to be affirmed that when an act is prohibited in express terms by a statute, such prohibition cannot be contracted so as to embrace only such persons as guiltily do such act, by the unassisted force of such maxim.

The course of the inquiry, therefore, has led to this point: is there anything in the language of the statute now to be construed, or in the legislative design displayed in it, or in the consequences, if its terms are construed strictly, by force of which this court can limit its operation to those only who act with consciousness of violating the law?

Now it is incontestable that, in view of the interpretation above put upon this provision of the statute, the duty thereby required of this defendant was of the simplest possible character. According to that interpretation the legislature, in effect, said to these freeholders, "yourselves fix the sum requisite for your expenditure during the year, but you are interdicted from making any payment or contracting any debt beyond such limit." I find it impossible to regard such a prohibition as involving any idea of complexity, or difficulty in its execution. To obey such an injunction seems, to my mind, a very intelligible matter indeed; certainly a duty much

easier of performance than that of the retailer of tobacco, mentioned in the case already cited from *Meeson & Welsby*, who was enjoined, under a penalty, not to have in his possession any adulterated tobacco, and which duty, his counsel contended, could only be perfectly and certainly performed by having a chemical analysis made of each sample that he purchased. If the duty, then, be a simple one, and not one which is subject to very great difficulties in its performance, there is nothing in the nature of the act prohibited from which the court can say, in the face of the legislative language, that it was not the intention to make it applicable to every one who should violate its letter. Counsel indeed pressed upon the court the consideration that this statute, from the infelicity of its phraseology, was, with respect to its purpose or application, open to much question, and that in point of fact professional gentlemen had expressed variant opinions with regard to it. This may be so, but when the question is as to the intention of the legislature, this argument is out of place. It would be preposterous for this court to hold that the legislature, in this act, has intended to punish the person who infringes the letter of this law, without regard to the question of his moral delinquency, and at the same time to say that such effect shall not be given to the statute, because of the lame way in which it has been penned. This would be to put the case upon the rejected ground of the hardship arising from applying the law to a person whose mind was not guilty, instead of abiding by the adopted doctrine of ascertaining the intention of the law maker. The sole business of the court is to find the meaning of this law, and then to give it effect in that sense. It will also be observed that the result to which I have come, that this duty imposed on the freeholders is a plain one and one not difficult of performance, dissipates all idea that the court can, by construction, control the generality of its terms, on the ground that, read in its rigor, it bears so hardly on this class of officers as to raise a presumption against such an interpretation. If there has been any hardship, it has arisen from the verbal obscurity

of the statute, and such a consideration, it has been' just re-marked, ought not to affect the mind of the court. Nor is it the province of the court to say whether this law is too rigor-ous or not; that is the part of the legislature; but it certainly is not clear that such a regulation may not be subservient to a wise public policy. Entertaining the view that the act which this defendant was ordered to abstain from doing was neither difficult to comprehend or to perform, I find myself unable to yield to the notion that the language of the provi-sion in question can be curtailed by construction.

The judgment should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, DE-PUE, REED, SCUDDER, VAN SYCKEL, WOODHULL, CLEMENT, DODD, GREEN, LILLY—11.

*For reversal*—None.